UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKS OF
AMERICA (UAW), *et al.,*

        Plaintiffs,                              Case No. 11-14434
                                                                     Honorable Julian Abele Cook, Jr.

v.

KELSEY-HAYES COMPANY, et al.,

        Defendants.

ORDER

This lawsuit arises out of a dispute between retired members of Local No. 78 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, ("Union") and their former employer, Kelsey-Hayes, over modifications to their health insurance. During all times that are relevant to this controversy, the Union was the collective bargaining organization for the identified individual Plaintiffs[1] and other persons who worked at a manufacturing plant in Detroit, Michigan.

This lawsuit began with the filing of a complaint on October 7, 2011 by the Plaintiffs, all of whom alleged that the Defendants had, *inter alia,* breached the terms of the parties' collective

---

[1] Plaintiff James Ward retired from Kelsey-Hayes on September 20, 1998. Plaintiffs Marshall Hunt and Richard Garden retired from Kelsey-Hayes on December 31, 1999. All have been receiving fully paid healthcare coverage from Kelsey-Hayes under a group plan.

bargaining agreement, and in doing so, violated its responsibilities under an existing ERISA benefit plan. On November 16, 2011, the Plaintiffs filed a motion for summary judgment, seeking to obtain relief relating to issues that had been outlined in the first two counts of their amended complaint. (Docket Entry 14). In proffering their dispositive motion, the Plaintiffs have urged the Court to (1) determine that they, along with their surviving spouses, are entitled to a lifetime of fully-paid retirement healthcare benefits, and (2) issue a permanent injunction which, if granted, would preclude the Defendants from terminating, or attempting to terminate, the existing group health plan. Several days later, the parties filed a series of motions,[2] all of which are currently pending before the Court. On December 19, 2011, the Court conducted a hearing during which it restricted the parties to arguments relating only to the merit of compelling arbitration in this matter.

I.

A series of collective bargaining agreements over the years covered the production and maintenance employees who worked at the Detroit plant. In the final collective bargaining agreement which was negotiated between Kelsey- Hayes and the Union in 1998, the parties collectively agreed that the insurance health benefits would be governed by two separate documents; namely, "Supplement H" and "Supplement H-1," the terms of which were incorporated into the 1998 collective bargaining agreement. Article I, Section 3(b)(7) of the 1998 Supplement H-1 provides that the company "shall contribute the full premium or subscription charge" for healthcare. (Supplement

---

[2]The official record in this action reveals that the following motions were filed by the parties, all of which are currently pending before the Court for a decision; namely, (1) Plaintiffs' motion for class certification (filed on November 21, 2011) [Docket Entry 21]; (2) Defendants' motion to compel arbitration (filed on November 29, 2011) [Docket Entry 25]; and (3) Defendants' motion for relief pursuant to Fed.R.Civ.P.56(d) (filed on November 30, 2011) [Docket Entry 26].

H, Plaintiff's Amended Motion for Summary Judgment, Exhibit D, Docket Entry 14-5 at 3).

A brief description of the various owners of the manufacturing facility in Detroit is necessary to understand the scope of the current dispute.

In 1992, Kelsey-Hayes assumed ownership of the facility and continued to operate it until 2000[3] when the plant was sold to American Commercial Industries ("ACI"). In the transfer of ownership, Kelsey-Hayes retained the right to regain operations at the facility if ACI's venture failed. In October of 2000, when ACI experienced financial problems, Kelsey-Hayes resumed control over the operations of the plant which ultimately closed its doors during the following year.

On April 17, 2001, the principals in the labor-management operations of the company entered into a Plant Closing Agreement in which the Union waived most of its claims against TRW, Kelsey-Hayes, and ACI. However, the Union did not waive its claims regarding pension or healthcare obligations. Rather, the parties agreed that "any obligation of [ACI] or TRW with respect to . . . payments to retirees for retiree health care . . . shall be governed by applicable law and benefit plans (including those provisions contained in collective bargaining agreements) and are not released by this Agreement." (Exhibit B, Plaintiffs' motion for summary judgment, Docket Entry 14). The parties also agreed to a clause which required all disputes relating to the "application and interpretation" of the Plant Closing Agreement to be resolved through arbitration.

In 2002, TRW was acquired by Northrop Grumman. In February 2003, Northrop Grumman sold a portion of TRW's assets in order to form a new business known as TRW Automotive. In 2004, TRW Automotive went public and became known throughout the industry as TRW Automotive Holdings Corporation, the parent company of Kelsey-Hayes.

---

[3]TRW was the parent corporation of Kelsey-Hayes from 1999 until 2002.

In September 2011, TRW Automotive, which had continued to administer the company's health care benefits program, notified the individual Plaintiffs and other retirees that effective January 1, 2012 it would discontinue its current healthcare plan for Medicare-eligible retirees and surviving spouses. To continue receiving health insurance, each Plaintiff was directed to set up an individual Health Reimbursement Account (HRA). TRW would provide a one time contribution of $15,000 for each eligible retiree and his or her spouse for 2012, as well as a $4,8000 contribution for each eligible retiree and his or her spouse for 2013. TRW reserved the right to review and terminate its future contributions. These Plaintiffs were directed to work with an advisor in order to select an appropriate individual health care plan.

II.

In the context of a labor dispute, the Sixth Circuit has opined that "we begin with a presumption that national labor policy favors arbitration." *United Steelworkers of America v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007). The issue of arbitrability within the context of a labor dispute in the Sixth Circuit is guided by the four principles of *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643 (1986); namely,

> (1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration; (2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is a question for judicial determination; (3) in making this determination, a court is not to consider the merits of the underlying claim; and (4) where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *Int'l Union v. Cummins, Inc.,* 434 F.3d 478, 4875 (6th Cir.2006).

When there is a general or broad arbitration clause, "the presumption of arbitrability [is] 'particularly applicable,' and only an express provision excluding a particular grievance from

arbitration or 'the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *Teamsters Local Union No. 89 v. Kroger Co.,* 617 F.3d 899, 905 (6th Cir.2010) (internal citation omitted). Finally, "when the language is ambiguous or unclear, any doubts concerning the scope of arbitrability should be resolved in favor of arbitration. Arbitration may not be denied unless the party contesting arbitrability can establish with positive assurance that the arbitration clause cannot be interpreted so as to cover the dispute at issue." *International Brotherhood of Electrical Workers v. AT&T Network Systems*, 879 F.2d 864 (6th Cir.1989) (internal citation omitted).

III.

The Defendants contend that the Plaintiffs' claims are subject to mandatory arbitration because their claims relate to the interpretation and application of the Plant Closing Agreement, which contains a broad arbitration clause. However, the Plaintiffs challenge this argument, contending that the parties herein are not under any obligation to arbitrate because (1) Sixth Circuit precedent clearly states that retirees cannot be forced to arbitrate their claims; (2) the Plant Closing Agreement excludes retiree benefits from the general arbitration clause; (3) the Plaintiffs rely primarily upon the collective bargaining agreement and not the Plant Closing Agreement for their claims; and (4)some of the retirees in this action are excluded from the application of the Plant Closing Agreement. These arguments will be considered in turn.

A

The Plaintiffs point to two Sixth Circuit cases which, in their opinion, establish that a retiree and surviving spouse cannot be forced to arbitrate his or her claim for retiree benefits. They cite *United Steelworkers of America v. Cooper Tire & Rubber Co.*, 474 F.3d 271 (6th Cir.2007) for the proposition that arbitration is an option only if the retiree consents to it. However, this is a strained

reading of the case. In *Cooper Tire*, the union sued the company to compel arbitration after seeking certification of the retirees as a class. The Sixth Circuit held that while the union had standing to sue, it may only arbitrate on behalf of those retirees who gave their consent to union representation for arbitration. Thus, a union may not arbitrate on behalf of a retiree without consent. (*Id.* at 283).

Plaintiffs also point to *Cleveland Electric Illuminating Co. v. Utility Workers of America, Local 270*, 440 F.3d 809 (6th Cir.2006) for the proposition that retirees cannot be compelled to arbitrate. However, the essential distinction between the case at hand and this cited case is that in *Cleveland Electric*, unions could not compel the arbitration of the retirees' claims without their prior consent. On the other hand, the Court finds the facts in *Burcicki v. Newcor, Inc.*, 2010 U.S. Dist. LEXIS 27353 (E.D. Mich. Mar. 23, 2010) to be analogous to the case at bar. In *Burcicki*, a group of individual retirees, with similarly asserted claims under the LMRA and ERISA, maintained that they had been guaranteed lifetime healthcare benefits by their former employer. These claims were also based partly on a termination agreement that provided health insurance coverage after the closure of the manufacturing plant where the retirees had worked. The defendants asserted that since the parties' termination agreement contained a broad arbitration clause, the plaintiffs were required to arbitrate their claims. The plaintiffs, relying on *Cooper Tire* and *Cleveland Electric*, argued that since retirees were not subject to the arbitration provision, they could pursue their claims directly against the defendants in court. This argument was rejected by the judge who found their claims to be subject to mandatory arbitration under the termination agreement.

In particular relevance to the case at bar, the judge wrote:

> [p]laintiffs misapprehend the rulings in [*Cleveland Electric* and *Cooper Tire*], from which they also quote in their Reply Brief. Contrary to what [p]laintiffs' selective quotations would suggest, however, neither of those cases had anything to do with compelling individual union retirees to arbitrate their dispute. Rather, both of these

> cases merely held that the retirees were not required to have their union litigate their disputes for them nor could the union force its representation upon the retirees. *Id.* at \*37-38.

This Court likewise finds the Plaintiffs' reliance on *Cooper Tire* and *Cleveland Electric* to be unpersuasive. Here, the Plaintiffs have neither proffered nor established any Sixth Circuit precedent that exempts retirees from mandatory arbitration if and when it is required by a contract or some other agreement. While a union may need the individual retirees' consent in order to arbitrate on their behalf, there is no wholesale exemption of this group of former employees from being subject to otherwise applicable clauses in which arbitration is mandated.

B.

Next, the Plaintiffs contend that the Plant Closing Agreement does not mandate arbitration for disputes over retiree benefits. They correctly point to paragraph five of the Plant Closing Agreement which states that retiree benefits shall be governed by the collective bargaining agreement:

> Notwithstanding the Release contained in paragraph 1 above, any obligation of the Company or TRW with respect to any pension plan or payments to retirees for retiree health care, life insurance, or short or long term disability benefits, shall be governed by applicable law and benefit plans (including those provisions contained in collective bargaining agreements) and are not released by this Agreement.

However, it appears that the Plaintiffs may have overlooked other pertinent paragraphs within the Plant Closing Agreement. Although health and other benefits were to be governed by the applicable law, the 1998 collective bargaining agreement was terminated by the Plant Closing Agreement. Paragraph two of this Plant Closing Agreement states that "[t]he Contract [the 1998 CBA] as assumed by the Company, between the Company and the Union shall be deemed to have terminated as of April 30, 2001 without further liability under

the Contract except for the specific obligations expressly set forth in this agreement." This clause terminated the 1998 collective bargaining agreement, including its anti-arbitration provision. There is no specific obligation which expressly provides that disputes relating to health care benefits would be exempted from otherwise mandatory arbitration. The Plant Closing Agreement contains an arbitration clause of broad applicability, which covers "any dispute or disagreement concerning the interpretation and application of this Agreement." With an arbitration clause of broad applicability, "only an express provision excluding a particular grievance from arbitration or 'the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *Teamsters Local Union No. 89 v. Kroger Co.,* 617 F.3d 899, 905 (6th Cir.2010) (internal citation omitted). There is no such provision or evidence here.

C.

Third, the Plaintiffs argue that they only rely on the Plant Closing Agreement because of the changes in ownership that occurred during the final years of the plant's operation and the changes of corporate parenthood that occurred following the plant's closure. The Plaintiffs contend that the 1998 collective bargaining agreement is the primary source of their claims and therefore, the arbitration clause of the Plant Closing Agreement should not control. However, the Plaintiffs can only rely upon the 1998 collective bargaining agreement to the extent that it was not abrogated by the Plant Closing Agreement  Indeed, it is the Plant Closing Agreement that assigns responsibility for providing health benefits to Kelsey- Hayes and its former corporate parent, TRW Inc. The Plant Closing Agreement extinguishes the anti-arbitration provision of the 1998 collective bargaining agreement with

a general arbitration clause. On the basis of these circumstances, the Plaintiffs cannot claim that the Defendants are responsible to adhere to the terms of the Plant Closing Agreement while they seek to avoid the arbitration that is mandated by the same agreement.

D.

Finally, the Plaintiffs submit that, even if the arbitration clause of the Plant Closing Agreement is applicable, it does not apply to those persons who retired prior to the plant closing. However, they submit that "[p]laintiffs also cite the closing agreement which shows that the benefits were not limited to the duration of the [collective bargaining agreement] and to explain why employees retiring were eligible for retiree benefits from Kelsey-Hayes after January 2000, when a different company temporarily took over the Detroit plant." (Plaintiffs' response at 7, Docket Entry 32). Additionally, the Plaintiffs, in their motion for summary judgment, cite to the Plant Closing Agreement as support for their claim that the Defendants are obligated to provide certain health care benefits to the retirees. The Plant Closing Agreement is an essential document to the Plaintiffs' claims. The application and interpretation of its provisions, along with its interaction with the remaining clauses of the 1998 collective bargaining agreement will define the Plaintiffs' claims. The Court cannot look to the Plant Closing Agreement for a selective clause that would guarantee health benefits while ignoring another clause therein which mandates arbitration. Therefore, the Defendants' motion for arbitration must granted.

IV.

In light of the foregoing, the Plaintiffs' motions for summary judgment (Docket Entry 14) and for class certification (Docket Entry 21) are denied without prejudice. The

Defendants' motion for Rule 56(d) relief (Docket Entry 26) relief is denied for mootness in light of the preceding disposition.

      IT IS SO ORDERED.


Dated:  December 22, 2011                         S/Julian Abele Cook, Jr.
       Detroit, Michigan                            JULIAN ABELE COOK, JR.
                                                     United States District Court Judge


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on December 22, 2011.

                                                           s/ Kay Doaks
                                                           Case Manager