UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW), et al.,

             Plaintiffs,

    vs.

KELSEY-HAYES COMPANY, et al.,

             Defendants.

_____/

Case No. 11-CV-14434

HON. GEORGE CARAM STEEH

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [DOC. 85], AND GRANTING IN PART PLAINTIFFS' MOTION
<u>FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION [DOC. 86]</u>

      This is a class action case brought by plaintiff retirees alleging breach of

collective bargaining agreement ("CBA") under Section 301 of the Labor-Management

Relations Act ("LMRA"), 29 U.S.C. §185, and for breach of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq.*, and breach of fiduciary duty in

violation of ERISA.  Plaintiff International Union, United Automobile, Aerospace, and

Agricultural Implement Workers of America ("UAW" or "Union") sues for breach of the

CBA under LMRA Section 301.  The plaintiff class was previously certified by the court.

[Doc. 92].

      In 1998 defendant Kelsey-Hayes entered into a CBA with the UAW which

represented the employees of its Detroit manufacturing plant.  The 1998 CBA provided

comprehensive healthcare coverage to its retirees and their surviving spouses.  In 2001,

Kelsey-Hayes closed its Detroit manufacturing plant and negotiated the Plant Closing

-1-

Agreement with the Union.  The Plant Closing Agreement addressed benefits provided to retirees, the effect of the Plant Closing Agreement on previous CBAs, and a method for resolving disputes arising out of the agreement.  The named plaintiffs before the court today each retired prior to the Detroit plant's closure on April 17, 2001.

Kelsey-Hayes continued to provide healthcare benefits under the terms of the 1998 CBA for ten years after the plant closed.  In September 2011, Kelsey-Hayes announced plans to terminate retiree participation in the retiree healthcare plan and required retirees to purchase individual plans for Medicare supplemental insurance paid for out of company funded Health Reimbursement Accounts ("HRA").

In October 2011, the retirees filed this suit alleging breach of the CBAs under Section 301 of the LMRA and violation of an ERISA benefit plan against Kelsey-Hayes and TRW Automotive Holdings Corp. ("TRW"), and breach of fiduciary duty under ERISA against TRW.  The complaint also alleges that Northrop Grumman is liable for damages as the successor to TRW, Inc. if TRW or Kelsey-Hayes terminate the plan or otherwise reduce retiree benefits.

Kelsey-Hayes and TRW moved for an order to compel arbitration relying on the Plant Closing Agreement's general arbitration clause.  Defendant Northrop Grumman filed a separate motion to compel arbitration.  The district court (J. Cook) initially granted the motions to compel arbitration in their entirety.  Upon reconsideration, the district court reversed itself in part, finding that a subset of plaintiffs - those who had retired prior to the plant closing in 2001 - could not be bound by the terms of the Plant Closing Agreement because their rights had already vested under the 1998 CBA.  The 1998 CBA provides that any healthcare-related disputes are exempt from otherwise

-2-

applicable provisions requiring disputes to be resolved through arbitration.

Kelsey-Hayes appealed, and the Sixth Circuit (Rogers, Griffin, Donald) affirmed, holding that the employees who retired prior to the 2001 Plant Closing Agreement did not consent to the terms of the Plant Closing Agreement and could not be compelled to arbitrate under provisions contained in that agreement.  *UAW v. Kelsey-Hayes*, 557 Fed. Appx. 532 (6th Cir. 2014).

Defendants moved to stay this litigation pending the Supreme Court's ruling in *M&G Polymers USA, LLC v. Tackett*.  In that case, the Supreme Court took up the issue of how to interpret silence concerning the duration of retiree health-care benefits when construing collective bargaining agreements.  This court agreed to stay this litigation, and the Supreme Court issued its opinion on January 26, 2015.  *Tackett*, 135 S.Ct. 926 (2015).  The parties re-filed their motions for summary judgment, and re-briefed their arguments to incorporate the Supreme Court's decision.

## FACTS

The plaintiffs are medicare-eligible retirees who worked at a Detroit automotive plant owned by Kelsey-Hayes from 1992 until 2000.  The plaintiffs were production and maintenance employees, and were represented for collective bargaining purposes by the UAW.  The last of a series of CBAs was negotiated in 1998, which incorporated two separate documents covering insurance benefits, referred to as Supplement H and Supplement H-1.

There are many entities involved in the history of the Detroit facility.  **Kelsey-Hayes** owned and operated the facility from 1992 until 2000.  The **UAW** represented the production and maintenance workers at the Detroit facility prior to its closure in 2001.

**Lucas Varity** was the parent corporation of Kelsey-Hayes from 1996 to 1999. Lucas Varity sold its assets to **TRW, Inc.**, a competitor, who was the parent corporation of Kelsey-Hayes from 1999 until 2002. Kelsey-Hayes remained the owner of the plant until **American Commercial Industries (ACI)** purchased the Detroit facility from TRW, Inc. in 2000 and owned it until 2001. ACI assumed the UAW CBA existing at the time of the acquisition. Kelsey-Hayes retained the right to re-assume operation of the facility if ACI became insolvent, which it did. Kelsey-Hayes took financial responsibility for the Detroit operation in October 2000, while ACI retained ownership of the facility and the CBA with the UAW. The plant closed in 2001.

In connection with the closing of the Detroit facility, the UAW negotiated a Plant Closing Agreement with ACI. TRW Inc. was a party to the agreement as Kelsey-Hayes' parent. The UAW waived all claims against these entities on behalf of its members. The only qualification to the waiver was that the closing agreement did not extinguish pension or retiree health care obligations owed by ACI or TRW, Inc., to the extent that either entity had any such obligations "under applicable law and benefit plans (including those provisions contained in collective bargaining agreements)." (Release, para. 5).

In 2002, **Northrop Grumman** acquired TRW, Inc. Northrop Grumman sold a portion of the former TRW, Inc.'s automotive assets to a private equity firm. These assets were then conveyed to a new business known as **TRW Automotive Holdings Corp. (TRW)**. TRW went public in 2004 and is the present parent entity of Kelsey-Hayes. The name TRW is an asset purchased from Northrop Grumman; there is no historical relationship with or continuity from the prior TRW Inc. entity. The defendants in this case are Kelsey-Hayes, TRW and Northrop Grumman.

-4-

Since the Detroit plant closed and the 1998 CBA expired, retirees have experienced a number of changes in their health insurance coverage.  In 2007, Kelsey-Hayes changed insurance carriers from Blue Cross Blue Shield of Michigan to Meritain, and in 2009 from Meritain to Humana.  No individual or entity objected to these changes.

Changes in Medicare benefits and regulations over the years led to private companies offering "Medigap" plans, which cover costs not covered by Parts A, B and D (prescription drugs).  Tax-free Health Reimbursement Accounts (HRA) also became available to pay the cost of so-called gap coverage.  On September 14, 2011 Kelsey Hayes sent letters to retirees and surviving spouses explaining that beginning January 1, 2012, it was establishing HRAs for all retirees over the age of 65 and their eligible dependents, in lieu of the group insurance plan under which they previously were covered.  Kelsey-Hayes contributed $15,000 to each participant's HRA in 2012 and $4,800 to each participant in 2013 and 2014.  A retiree and spouse would have a combined three-year total of $49,200 in HRA funds.  Kelsey-Hayes has made no assurances of funding the HRAs beyond 2014.  In the Summary Plan Description (SPD) explaining the HRAs, Kelsey-Hayes declared it "may, at any time" "decrease or eliminate the amount that is allocated to your HRA account each year" and "reserves the right to amend, modify, suspend, replace or terminate any of its plans, policies or programs (including the HRA), in whole or in part, at any time and for any reason."

Kelsey-Hayes has been able to provide insurance coverage through the HRAs at a substantially lower cost than a group insurance plan.  With the funds provided by Kelsey-Hayes, the retirees can purchase the most comprehensive medicare

-5-

supplemental insurance available as well as cover virtually anything left over from Medicare Parts A and B.  Plaintiffs argue that the 1998 CBA provided them with a vested, lifetime right to unalterable retiree health insurance.  According to plaintiffs, the HRAs shift company costs, administrative responsibilities and expenses, and financial risks to retirees and violate the 1998 CBA, the Plant Closing Agreement and ERISA.

The UAW and Kelsey-Hayes went to arbitration on the claims of the post-closing retirees.  Arbitrator Paul Glendon granted the UAW's motion for summary judgment and injunctive relief on January 18, 2013.  The Award directs that Kelsey-Hayes "forthwith shall rescind" the 2012 changes and "reinstate" and "restore" the "coverages" in force before 2012.  The Award concludes that the 1998 CBA promised retirees "the *vested right*" to the "medical plan coverages" "*for their lifetimes*," and that Kelsey-Hayes breached the 1998 CBA by imposing the HRAs.

## ANALYSIS

### I.  Background

"Section 301 of the LMRA provides a federal right of action for 'violations of contracts between an employer and a labor organization representing employees.'" *Moore v. Menasha Corp.*, 690 F.3d 444, 450 (6th Cir. 2012) (citing 29 U.S.C. § 185).  Further, "the LMRA claim also creates a derivative ERISA claim, because the disputed healthcare benefits were agreed upon pursuant to a union negotiated contract."  *Id.* (citing *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009)).  The core issues are "whether the retirement health care benefits vested for life" and whether they are "fully funded" by the employer.  *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 574 (6th Cir. 2006).

-6-

"Retiree healthcare-benefit plans, such as those involved here, are welfare-benefit plans; vesting only occurs if the parties so intended when they executed the applicable labor agreements." *Cole v. ArvinMeritor*, 549 F.3d 1064, 1069 (6th Cir. 2008). "[A]n employer that contractually obligates itself to provide vested healthcare benefits renders that promise 'forever unalterable.' " *Moore*, 690 F.3d at 450 (citing *Sprague v. GMC*, 133 F.3d 388, 400 (6th Cir. 1998)); see also *Noe v. PolyOne Corp.*, 520 F.3d 548, 564 (6th Cir. 2008) ("[I]t is not the prerogative of the judiciary to rewrite contracts in order to rescue parties from their 'improvident commitments.' "); *Allied Chemical Workers v. PPG Co.*, 404 U.S. 157, 182 n. 20 (1971) ("[V]ested retirement rights may not be altered without the pensioner's consent."); *Yolton*, 435 F.3d at 578 ("the employer's unilateral modification or reduction of [vested] benefits constitutes a LMRA violation."). Unilateral modification of vested healthcare is unlawful, even where the employer is motivated to reduce costs.

### A. 1998 Collective Bargaining Agreement

#### 1. Promises Regarding Healthcare

Article III of Supplement H-1 addresses Health Care Benefits. Section 1 of Article III provides for the establishment of health care coverages, including hospital, surgical, medical and prescription drugs, hearing aids, dental, vision, and substance abuse. Section 5 is entitled "Continuance of Health Care Coverages Upon Retirement," and subsection (a) provides: "The Health Care Coverages an employee has under this Article at the time of retirement shall be continued for such employees who retire under the following provisions of Article II of the Kelsey-Hayes Hourly Rate Employees Within a Bargaining Unit Pension Plan . . . ." The promise of "continuance" of health care

-7-

coverage is made to surviving spouses of employees or retired employees in section 6.

Article I, Section 1(b) addresses company contributions for health care coverages. Retired employees are addressed in subparagraph (7), which provides that the company shall contribute the full premium or subscription charge for health care coverage continued in accordance with Article III, Section 5.

### 2. Duration Provisions

The 1998 CBA contained a duration provision wherein the agreement continued through February 1, 2002, provided that if neither party gave notice of termination, the agreement would continue from year to year. Notice to terminate had to be in writing, and given six months in advance of termination. The agreement could be modified by agreement of the parties. (1998 CBA, Article XVI).

The 1998 CBA incorporated a Supplemental Insurance Program, providing that Supplement H was "part of this Agreement and subject to all provisions of this Agreement." (1998 CBA, Article XIV). Supplement H, in turn, adopted the "Supplement H-1" insurance program. Supplement H expressly adopted the same expiration date as the 1998 CBA. (Suppl H, Section 10). In this way, the 1998 CBA and the insurance supplements made it clear that they were subject to the CBA's duration clause.

### 3. Modification Provisions

The ability to make modifications to healthcare benefits is addressed in several provisions. Supplement H-1, Article III, Section 1(f) provides for the Replacement or Supplementation of Plan Coverages: "If, in its judgment, the Company considers it advisable in the interest of the eligible primary enrollees another arrangement may be substituted for all or part of the coverages referred to in subsection (a) above."

-8-

Appendix A to Supplement H-1 also addressed Kelsey-Hayes' right to change benefits:

F.  Changes in the Health Care Benefits

Any rate of payment by the enrollee and any other terms and conditions of Article III may be changed at any time by the Company. Reasonable notice of such changes will be furnished to enrollees and/or affected parties as necessary.

From time to time additional coverages may be provided or existing coverages withdrawn by the Company.  In either event, adequate notice shall be given to the enrollees by the carrier(s).

Supplement H, Section 1 contains a mutual agreement clause, as well as a provision dictating how conflicts between Supplement H (Agreement) and Supplement H-1 (Program) should be resolved.  The first paragraph states that if there is a conflict between the provisions of Supplement H and Supplement H-1, the provisions of Supplement H take precedence as necessary to eliminate such conflict.  The second paragraph provides that defendants cannot unilaterally modify the health benefits provided for in the CBA, that defendants would need the agreement of the union to make changes to benefits, and that such new benefits must be "as closely related as possible and of equivalent value" to those originally provided:

The Company will establish an amended insurance program, hereinafter referred to as the "Program", a copy of which is attached hereto as Supplement H-1 and made a part of this Agreement to the extent applicable to the employees represented by the Union and covered by this Agreement as if fully set out herein, modified and supplemented, however, by the provisions hereinafter.  In the event of any conflict between the provisions of the Program and the provisions of this Agreement, the provisions of this Agreement will supersede the provisions of the Program to the extent necessary to eliminate such conflict.

In the event the initiation of any benefit or benefits described in Article III of the Program does not prove practicable or is not permitted by the plans under which coverages are provided on the dates stipulated in

-9-

such Article III, the Company in agreement with the union will provide new benefits and/or coverages as closely related as possible and of equivalent value to those not provided.

## B. Detroit Plant Closing Agreement

### 1. Termination

In connection with the closing of the Detroit facility, the UAW, ACI and TRW Inc. negotiated a plant closing agreement in which they agreed to terminate the CBA approximately one year prior to the date contemplated in the 1998 CBA.  The closing agreement provided: The [1998 CBA] . . . between the Company and the Union shall be deemed to have terminated as of April 30, 2001 without further liability under the [1998 CBA] except for the specific obligations expressly set forth in this Agreement."  (Closing Agreement, ¶2).

### 2. Exceptions

The closing agreement deemed the 1998 CBA terminated, but excepted obligations expressly set forth in the closing agreement itself.  The closing agreement contained a release for all claims, obligations and liabilities.  (Closing Agreement ¶1). There is an exception to the release as follows:  "any obligation of the Company or TRW with respect to any pension plan or payments to retirees for retiree health care, life insurance, or short or long term disability benefits, shall be governed by applicable law and benefit plans (including those provisions contained in collective bargaining agreements) and are not released by this Agreement."  (Closing Agreement ¶5).

The closing agreement also provided that employees eligible to retire as of the date of the closure (May 31, 2001) will be "eligible to participate in the medical plan and life insurance plan for retirees provided by Kelsey Hayes Co."  (Closing Agreement ¶7).

-10-

The closing agreement gave some employees "one year of additional credited and vesting service" and provided that if the "additional year allows them to retire under the terms of the Detroit Hourly [Pension] Plan, they will be eligible to receive retiree medical and life insurance benefits."  (Closing Agreement ¶8).

## II. *Yard-Man* and *Tackett*

For over three decades, the leading Sixth Circuit case on retiree benefits was *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983).  The issue in that case was whether the right to collectively bargained for insurance benefits survives the expiration of the agreement in which they were bargained.  The court explained that "whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends on the intent of the parties," and that "traditional rules of contractual interpretation are applied" to determine whether the parties so intended.  *Id.* at 1479.  In discerning the parties' intent, courts were instructed to first look to the language of the CBA, which was to be construed consistently with the entire document.  If the language was ambiguous, courts could then refer to extrinsic evidence to determine the parties' intent.  *Id.* at 1480; *see also Moore v. Menasha Corp.*, 690 F.3d 444, 451 (6th Cir. 2012); *USW v. Kelsey-Hayes Co.*, 750 F.3d 546, 551 (6th Cir. 2014).

The so-called *Yard-Man* inference stated that "when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree."  *Id.* at 1482.  Subsequent cases clarified that the *Yard-Man* inference was not a legal presumption that shifts the burden to the employer to disprove that benefits vested.  *USW*, 750 F.3d at 552 (citations omitted).  Rather, "in close cases, '[a] court

may find vested rights 'under a CBA even if the intent to vest has not been explicitly set out in the agreement.'" *Id.* (citations omitted).

The Supreme Court granted certiorari in another Sixth Circuit case, *M&G Polymers USA, LLC v. Tackett*, 561 F.3d 478 (6th Cir. 2009), to resolve an inconsistency in the circuit courts over how to interpret health care benefit provisions in collective bargaining agreements. In *Tackett*, the retirees' former employer announced that it would begin requiring retirees to contribute to the cost of their health care benefits. The retirees sued, alleging that the employer had promised to provide lifetime contribution-free health care benefits for them, their surviving spouses, and their dependents. This promise was contained in a pension agreement entered at the same time as the master collective bargaining agreement. The retirees argued that the employer had created a vested right to lifetime health care benefits that continued beyond the expiration of the agreement. The Sixth Circuit applied the *Yard-Man* inference, finding "it unlikely that [the Union] would agree to language that ensures its members a 'full Company contribution,' if the company could unilaterally change the level of contribution." *Id.* at 490.

In its review of *Tackett*, the Supreme Court found that the *Yard-Man* inference "violates ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." 135 S.Ct. 926, 935 (2015). The Court rejected the *Yard-Man* inference because it was based on "suppositions" about "all" collective bargaining. *Id.* The Court reasoned that the inference distorts any attempt "to ascertain the intention of the parties." *Id.* (citing 11 Williston § 30:2, at 18). "*Yard-Man's* assessment of likely behavior in collective bargaining is too speculative

and too far removed from the context of any particular contract to be useful in discerning the parties' intention." *Id.* The Court recognized that a court may look to known customs or usages in a particular industry to determine the meaning of a contract, but the parties must prove such customs or usages using affirmative evidentiary support in a given case. *Id.*

The Supreme Court admonished the Sixth Circuit for failing to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises. *Id.* at 936 (citing 3 A. Corbin, Corbin on Contracts §553, p. 216 (1960) (explaining that contracts that are silent as to their duration will ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time.")). Similarly, the Sixth Circuit failed to consider the traditional principle that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* at 937 (quoting *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991)). But these principles do "not preclude the conclusion that the parties intended to vest lifetime benefits for retirees." *Id.* *Litton* holds that CBA expiration does not end "obligations already fixed under the contract but as yet unsatisfied," that rights "accrued or vested" will "as a general rule, survive [CBA] termination," that post-expiration rights may arise from "the express or implied terms of the expired agreement," and that whether obligations survive CBA expiration is "determined by contract interpretation." 501 U.S. at 203, 206-07. Therefore, a collective bargaining agreement may provide in explicit terms that certain benefits continue after the agreement's expiration, but when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life. *Id.*

-13-

*Tackett* instructs courts reviewing provisions of collective bargaining agreements to apply ordinary contract principles to determine the intent of the parties.  If there is an ambiguity as to the duration of benefits, the court may look to customs or usages in the industry to determine the meaning of contract terms and the parties' intent, as long as there is affirmative evidentiary support for such customs or usages.

### III.  Interpretation of Contract Language

#### A.  Contract Principles

Post-*Tackett*, the law makes clear that in order for benefits provided for in a CBA to survive the expiration of the agreement, the parties' intent must be clearly stated. The 1998 CBA at Article III, Section 5(a), entitled "Continuance of Health Care Coverages Upon Retirement," promises the healthcare coverages an employee has "at the time of retirement shall be continued."  Similar promises of "continuance" are made to retirees' surviving spouses.  These promises contrast with the limited promises to other employees in the same CBA, e.g., employees on layoff (healthcare continues "up to 12 consecutive months"), off for disability (healthcare continues to "a maximum of the employee's years of seniority"), and fired or quit (healthcare ends on the "last day" of the termination month).  This shows that when the parties intended to make certain benefits of a limited duration, they expressly provided as much in the contract.  It is against that background that the parties could have, but did not, provide that retiree healthcare would commence at retirement and end upon the expiration of the CBA or at some other determinable time.

As the *Tackett* court recognized, the CBA's general duration clause is not necessarily inconsistent with the "express or implied" terms that may promise "that

certain benefits continue after the agreement's expiration." *Tackett*, 135 S.Ct. at 937 (citing *Litton*, 501 U.S. at 203, 207). All collectively-bargained vested benefits are promised in limited-duration CBAs with general duration clauses. The court must read the 1998 CBA as a whole and give effect to both the general duration clauses - governing overall CBA expiration - and the specific promises of "retiree health care" and "retiree medical" made in the 1998 CBA and 2001 closing agreement. "[W]ell-founded principles of contract law establish that 'specific terms and exact terms are given greater weight than general language'" and "separately negotiated or added terms are given greater weight than standardized terms." *Royal Ins. Co. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 420 (6th Cir. 2008).

The Plant Closing Agreement terminated the 1998 CBA as of the April 30, 2001 plant closing "except for" identified "specific obligations" including "any obligation. . . with respect to . . . payments to retirees for retiree health care." (Plant Closing Agreement ¶¶ 2, 5). The Plant Closing Agreement also provided that employees eligible to retire as of the closing would "participate in" and "be eligible to receive retiree medical" benefits. (Plant Closing Agreement ¶¶ 7,8). It would be illogical to interpret the closing agreement as ending the obligation to provide retirees health care benefits since some employees only became eligible for such benefits by retiring at the plant closing. This negotiated promise of future retiree health care is contractual proof that the parties specifically intended that retiree health care survives the 1998 CBA expiration and the plant closing. *See Temme v. Bemis Co.*, 622 F.3d 730, 735-37, 739 (7th Cir. 2010) (holding that a plant closing CBA, "read together" with an expired CBA, promised retirees, and employees retiring at the closing, "lifetime entitlement to medical benefits";

-15-

the closing CBA excepted "retirement benefits" from its release and set "no termination date" or "method through which retiree benefits could end.")

The Plant Closing Agreement is clear that the company's obligations regarding payments for retiree health care survive the plant closing and the expiration of the 1998 CBA.  Defendants point out that Article II, Section F of Appendix A to Supplement H-1 of the Insurance Program provides that the company can *unilaterally* change "any rate of payment by the enrollee" as well as any "terms and conditions" of Article III, Health Care Benefits.  This clause is offered as evidence of the parties' intent that the company could alter retiree healthcare benefits as well as employee contributions.  However, the clause must be read in conjunction with the entire CBA, as well as the Plant Closing Agreement.  First, retiree health care was "perpetuated" by the Plant Closing Agreement, which excepted company obligations with respect to payments to retirees for retiree health care.  Second, the CBA provides that in the event of any conflict between the provisions of H and H-1, the provisions of H supersede those of H-1 to the extent necessary to eliminate such conflict.  Supplement H Section I contains a mutual agreement clause barring any changes to health care benefits and coverages absent union agreement.  Union agreement was not sought or given for Kelsey Hayes' HRA plan.  In order to eliminate conflict between the provision permitting the company to make unilateral changes to retiree health care and the provision requiring mutual agreement, the mutual agreement clause prevails.

In *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), the contract provided that retirees would receive insurance coverage "for life."  Yet, the Sixth Circuit still held that such language could not overcome the employer's reservation of the right

-16-

to terminate this coverage. *Sprague*, 133 F.3d at 401. The facts in *Sprague* are distinguishable because in this case the parties negotiated that the retiree health care benefits "shall be continued" in the absence of mutual agreement as to benefits and coverages by the company and the union.  In addition, company obligations with respect to retiree health care were specifically excepted from termination in the Plant Closing Agreement.

The foregoing discussion leads the court to the conclusion that the parties' intent was clearly manifested in the language of the 1998 CBA and the Plant Closing Agreement that retiree health care benefits were intended to survive the expiration of the CBA providing such benefits as well as the plant closing.

Having found no ambiguity as to the intended duration of retiree health care benefits under the two CBAs, *Tackett* instructs that extrinsic evidence should not be considered by the court.

### B. Preclusion Doctrines

The UAW and Kelsey-Hayes arbitrated whether the closing retirees have lifetime health insurance under the Plant Closing Agreement, and whether Kelsey-Hayes breached the Plant Closing Agreement and the relevant portions of the 1998 CBA incorporated therein.  Arbitrator Glendon ruled that the 1998 CBA promises retirees vested health insurance for their lifetimes, that this obligation was incorporated into the Plant Closing Agreement, and that the HRAs were not permissible or reasonable substitutes for the promised insurance absent union agreement.  Therefore, Kelsey-Hayes was found to have breached the Plant Closing Agreement and the relevant portions of the 1998 CBA.  Plaintiffs argue that the Glendon Award must be given

-17-

preclusive effect as it was a final and binding decision on the merits, it involved the same parties, it arose at Kelsey-Hayes' insistence, and all of the retirees are identically-situated (except for the timing of their retirements which triggered the arbitration forum for the closing retirees only).

Plaintiffs also argues estoppel with regard to Judge Gadola's decision in *Golden v. Kelsey-Hayes Co.,* 954 F.Supp. 1173 (E.D. Mich. 1997), and Judge Drain's decision in *USW v. Kelsey-Hayes Co.*, 943 F.Supp.2d 747 (E.D. Mich. 2013).  The *Golden* case addressed virtually identical CBA terms governing UAW retirees from Kelsey-Hayes' plants, finding that "shall be continued" and "continuance", when referring to health insurance, warranted judgment for the retirees solely on that "express contract language."  954 F.Supp. at 1188.  Judge Drain applied the findings in *Golden*, stating that Kelsey-Hayes was "barred from relitigating the meaning of the CBA terms by the doctrine of collateral estoppel."  *USW*, 943 F.Supp.2d at 755.

This court believes it is inadvisable, as well as unnecessary, to address plaintiffs' preclusion arguments because all of the decisions referred to by plaintiff were made before the Supreme Court issued its opinion in *Tackett*.  Even if the Glendon Award, *Golden* and *USW* did not expressly rely on *Yard-Man*, they were decided when *Yard-Man* was the law in this circuit.  Giving pre-*Tackett* decisions preclusive effect could have the effect of perpetuating the *Yard-Man* inference.  See *C.I.R. v. Sunnen*, 333 U.S. 591, 720 (1948); *Disabled American Veterans v. C.I.R.*, 942 F.2d 309, 313 (6th Cir. 1991) (Collateral estoppel will not apply where there has been a significant change in the legal atmosphere).

The same reasoning weighs against applying the so-called *Carbon Fuel* doctrine,

-18-

which stands for the proposition that earlier judicial interpretations of CBA terms become part of those terms if not later altered by the parties' agreement. *Carbon Fuel Co. v. UMWA*, 444 U.S. 212, 222 (1979). The theory is that if the interpretations do not reflect the parties' intent, they had sufficient opportunity to clarify their actual intent in subsequent CBAs. *Id.*

## III. Breach of Fiduciary Duty

In count three, plaintiffs allege a breach of fiduciary duty against TRW as administrator of the employee welfare benefit plan in violation of section 409 of ERISA, 29 U.S.C. § 1109. The court reserves judgment, and will address the issue should it become necessary in the future.

## IV. Defendant Northrop Grumman's Motion for Summary Judgment

Plaintiffs allege Northrop Grumman has successor liability to TRW, Inc., prior parent corporation of Kelsey-Hayes and party to the Plant Closing Agreement. Northrup Grumman acquired TRW, Inc. in 2002, after the Plant Closing Agreement had been entered. Plaintiffs alleges that Northrop Grumman was responsible for the liabilities of TRW, Inc. as a successor corporation, and in 2001, TRW, Inc. promised to honor "any obligation . . . with respect to . . . payments to retirees for retiree health care" in the Plant Closing Agreement.

A successor corporation generally is not responsible for its predecessors' liabilities unless they are expressly assumed. *NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 286-88 (1972). The court does not have sufficient evidence before it to determine successor liability, and therefore reserves its judgment on the issue at this time.

-19-

## **CONCLUSION**

Judgment is entered for the plaintiffs, retirees and UAW, under Rule 56 for breach of the CBAs under Section 301 of the LMRA and Section 502(a)(1)(B) of ERISA, and the following permanent injunction is entered pursuant to Rule 65(d):

A.  Defendants must comply with ERISA and their 1998 and 2001 CBA retiree healthcare obligations;

B.  Defendants must promptly restore the *status quo ante*;

C.  Defendants must provide the promised health insurance at no premium cost to class members, for the lifetime of each class member;

D.  Defendant must promptly take such action as necessary to identify, account for, and make whole class members for the expenses incurred by class members due to defendants' unilateral changes; and

E.  The court retains jurisdiction over the remaining issues in this case, as well as any post-judgment matters and issues of implementation and enforcement of the court's judgment and permanent injunction.

Dated:  September 17, 2015

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on September 17, 2015, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

-20-