# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Deborah S. Hunt  POTTER STEWART U.S. COURTHOUSE  Tel. (513) 564-7000
Clerk  CINCINNATI, OHIO 45202-3988  www.ca6.uscourts.gov

Filed: April 20, 2017

Mr. John G. Adam
Legghio & Israel
306 S. Washington, Suite 600
Royal Oak, MI 48067

Mr. Gilbert Brosky
Mr. Gregory Valentin Mersol
Baker & Hostetler
1900 E. Ninth Street, Suite 3200
Cleveland, OH 44114

Mr. Douglas A Darch
Baker & McKenzie
300 E. Randolph Street, Suite 5000
Chicago, IL 60601

Mr. Stuart M. Israel
306 S. Washington
Suite 600
Royal Oak, MI 48067-0000

Mr. William Arthur Wertheimer Jr.
30515 Timberbrook Lane
Bingham Farms, MI 48025

Re: Case No. 15-2285, *UAW, et al v. Kelsey-Hayes Co., et al*
Originating Case No. : 2:11-cv-14434

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW); JAMES WARD; MARSHALL HUNT; RICHARD GORDON,

                    *Plaintiffs-Appellees*,

      *v.*

KELSEY-HAYES COMPANY; TRW AUTOMOTIVE HOLDINGS CORPORATION; NORTHROP GRUMMAN SYSTEMS CORPORATION,

                  *Defendants-Appellants*.

> No. 15-2285

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-14434—Julian A. Cook, District Judge.

Argued: September 28, 2016

Decided and Filed: April 20, 2017

Before: GILMAN, GIBBONS, and STRANCH, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Gregory V. Mersol, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellants. William Wertheimer, LAW OFFICE OF WILLIAM WERTHEIMER, Bingham Farms, Michigan, for Appellees. **ON BRIEF:** Gregory V. Mersol, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellants. William Wertheimer, LAW OFFICE OF WILLIAM WERTHEIMER, Bingham Farms, Michigan, Stuart M. Israel, John G. Adam, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellees.

      GIBBONS, J., delivered the opinion of the court in which STRANCH, J., joined. GILMAN, J. (pp. 17–22), delivered a separate dissenting opinion.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge.  Defendants Kelsey-Hayes, TRW Automotive Holdings, and Northrop Grumman appeal the grant of plaintiffs' motion for summary judgment and the permanent injunction entered in plaintiffs' favor.  Plaintiffs are retirees who brought a class action alleging breach of a collective bargaining agreement ("CBA") under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, including breach of fiduciary duty.  For the reasons that follow, we affirm the district court's award of summary judgment and modify the permanent injunction.

I.

Plaintiffs are Medicare-eligible retirees from a Detroit automotive plant owned and operated by defendant Kelsey-Hayes Company, all of whom retired from the plant prior to its closing in 2001.  Pre-retirement, plaintiffs were production and maintenance workers at the plant and members of a bargaining unit represented by United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW").

Kelsey-Hayes owned and operated the plant from 1992 until 2000; the plant closed its doors in 2001.[1]  UAW negotiated and signed a CBA with Kelsey-Hayes in 1998.  This was the last CBA signed between UAW and Kelsey-Hayes on behalf of the plaintiffs.  The CBA incorporated two separate documents related to health-insurance benefits: Supplement H and Supplement H-1.  The CBA and its Supplements provided for comprehensive healthcare for retirees and their surviving spouses.  When the plant closed in 2001, the UAW negotiated a Plant Closing Agreement ("PCA") with ACI that addressed benefits provided to retirees at the time of

---

[1]From 1992 to 1996, Kelsey-Hayes was owned by the Varity Corporation.  In 1999, Lucas Varity Holding Company became the parent corporation of Kelsey-Hayes.  In 1999, Lucas Varity sold its assets to TRW, Inc. ("TRW"), which then owned Kelsey-Hayes until 2002.  Kelsey-Hayes remained the owner of the Detroit plant until American Commercial Industries ("ACI") purchased the facility from TRW in 2000.  Kelsey-Hayes retained the right to re-assume operation of the plant if ACI became insolvent.  In 2000, ACI became insolvent and Kelsey-Hayes again took over operation of the plant, while ACI retained ownership both of the plant and the CBA with UAW.

the plant's closing, the impact of the PCA on previous CBAs, and a method for resolving any disputes that arose from the PCA. Also party to the PCA was Kelsey-Hayes's parent corporation at the time, TRW.

The PCA included a provision whereby the UAW and its members waived all claims against ACI, TRW, and Kelsey-Hayes. It also included an exception to the UAW waiver, which stated that the closing agreement did not extinguish pension or retiree healthcare obligations owed by ACI or TRW Inc., to the extent that either entity had obligations "under applicable law and benefit plans (including those provisions contained in collective bargaining agreements)."

Northrop Grumman acquired TRW in 2002. Northrop Grumman sold a portion of TRW's automotive assets to a private equity firm, and these assets were then conveyed to a new entity, TRW Automotive Holdings Corp. ("TRW AHC").[2] TRW AHC went public in 2004 and presently owns Kelsey-Hayes.

Kelsey-Hayes continued to provide healthcare coverage for its retirees and their surviving spouses for ten years following the PCA, consistent with the terms for coverage contained in the 1998 CBA. While coverage has remained consistent, it has undergone multiple changes. In 2007, Kelsey-Hayes changed insurance carriers from Blue Cross Blue Shield of Michigan to Meritain, and in 2009, it switched to Humana. According to Kelsey-Hayes, "[e]ach change in carrier was accompanied by a possible change in networks, providers, and/or the enrollment process."

Kelsey-Hayes explained in a September 14, 2011 letter that, effective January 1, 2012, it was replacing retirees' current group-insurance plan with an "HRA" model. Under this model, Kelsey-Hayes created company-funded health reimbursement accounts ("HRAs") from which retirees could purchase individual plans for Medicare supplemental insurance. The letter stated that, due to the evolving healthcare and insurance market, there were "now numerous cost effective and valuable plans on the open market . . . . Given this expanded market and increased competition . . . health-insurance carriers have stepped forward to offer a variety of [Medicare

---

[2]TRW AHC is unrelated to TRW. The "TRW" name was an asset purchased from Northrop Grumman without any other relationship or continuity to the TRW entity. TRW is not a defendant in this case.

Case: 15-2285 Document: 105-2 Filed: 04/20/2017 Page: 6 (6 of 25)

supplement options] that in many cases offer the same or better coverage than you currently have from the TRW Retiree Health Care Plan."  In 2012, Kelsey-Hayes contributed $15,000 to each participant's HRA and in 2013 and 2014, it contributed $4,300 per year.

The Summary Plan Description for the new HRA plan included language that Kelsey-Hayes "may, at any time, increase, decrease or eliminate the amount that is allocated to your HRA account each year" and that it "reserves the right to amend, modify, suspend, replace or terminate any of its plans, policies or programs (including the HRA), in whole or in part, at any time and for any reason by appropriate company action."  It also included the specific language that retirees "are neither vested in your retiree benefits nor does TRW Automotive intend to vest you in retiree healthcare benefits."

Using the HRAs, Kelsey-Hayes has been able to provide insurance to its retirees at a substantially lower cost to the company.  The HRAs, as funded from 2012 through 2014, have provided $49,200 for each retiree and eligible spouse to purchase supplemental insurance.

Following notice of these changes, plaintiffs filed for relief against Kelsey-Hayes, TRW AHC, and Northrop Grumman in the district court under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

Kelsey-Hayes and TRW moved for an order to compel arbitration, relying on the PCA's arbitration clause.  Northrop Grumman filed a separate motion to compel arbitration.  The district court initially granted the motions to compel arbitration in their entirety, but upon reconsideration reversed in part, finding that a subset of plaintiffs—those who had retired before the 2001 plant closing—could not be bound by the PCA because their rights had already vested under the 1998 CBA and that their healthcare-related disputes were thus exempt from the CBA's arbitration clause.  Kelsey-Hayes appealed the district court's order.  We affirmed, holding that employees who retired prior to the 2001 PCA did not consent to the PCA's terms and could not be compelled to arbitrate pursuant to it.  *UAW v. Kelsey-Hayes Co.*, 557 F. App'x 532, 535 (6th Cir. 2014).

Defendants moved to stay litigation pending the Supreme Court's decision in *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), and we agreed. *Tackett* involved how to interpret silence concerning the duration of retiree healthcare benefits when construing CBAs, which would directly impact our decision in the case at hand. Following the Supreme Court's ruling in *Tackett*, which explicitly overruled decades of Sixth Circuit precedent established by *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), the parties re-filed cross-motions for summary judgment and re-briefed their arguments to incorporate the decision. The district court denied defendants summary judgment and granted the plaintiff-retirees partial summary judgment, as well as a permanent injunction ordering defendants to reinstate the retirees' group-insurance plan. Defendants timely appealed.

## II.

We review a district court's grant of summary judgment *de novo*. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 866 (6th Cir. 2006) (citing Fed. R. Civ. P. 56(c)). We construe all reasonable inferences in favor of the nonmoving party. *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 818 (6th Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

When considering a district court's order for a permanent injunction, we review factual determinations for clear error, legal conclusions *de novo*, and the injunction's scope for abuse of discretion. *ACLU of Ky. v. McCreary Cty.*, 607 F.3d 439, 445 (6th Cir. 2010).

## III.

"Section 301 of the LMRA provides a federal right of action for 'violation[s] of contracts between an employer and a labor organization representing employees.'" *Moore v. Menasha Corp.*, 690 F.3d 444, 450 (6th Cir. 2012) (citing 29 U.S.C. § 185(a)). It also creates "a derivative ERISA claim, because the disputed healthcare benefits were agreed upon pursuant to a union-negotiated contract." *Id.* (citing *Schreiber v. Philips Display Components Co.*, 580 F.3d 355,

363 (6th Cir. 2009)).  The primary inquiry here is "whether the retirement health care benefits vested for life" and whether they are "fully funded" by the employer.  *See Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 574 (6th Cir. 2006).  "We interpret collective bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least where those principles are not inconsistent with federal labor policy." *Tackett*, 135 S. Ct. at 933.

### A.

Prior to *Tackett*, we applied principles first announced in *Yard-Man*, which stated that "when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree."  716 F.2d at 1482.  In *Tackett*, however, the Supreme Court found that the *Yard-Man* inference "violates ordinary contract principles by placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements."  *Tackett*, 135 S. Ct. at 935.  The *Tackett* court found that *Yard-Man* was based on "suppositions" about all collective bargaining and distorted attempts to discern the intention of the parties.  *Id.*  The *Yard-Man* inference was "too speculative" and "too far removed from the context of any particular contract to be useful in discerning the parties' intention" in any particular agreement.  *Id.*

Ultimately, the *Tackett* Court held that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life."  *Id.* at 937.  It noted, however, that "a court may look to known customs or usages in a particular industry to determine the meaning of a contract" as long as "the parties . . . prove those customs or usages using affirmative evidentiary support in a given case."  *Id.* at 935 (citing 12 R. Lord, *Williston on Contracts* § 34:3 (4th ed. 2012)).  The ultimate question, in any case interpreting the language of retiree health benefits contained in CBAs, is what the parties intended.  *See id.* at 937.

Under *Tackett*, a court evaluating a CBA should use traditional principles of contract interpretation, such as the principle that courts should not construe ambiguous writings to create lifetime promises.  *Id.* at 936 (citing 3 A. Corbin, *Corbin on Contracts* § 553, at 216 (1960)

(recognizing that contracts silent as to their duration will ordinarily not be "operative in perpetuity" but treated as "operative for a reasonable time.")). However, overruling the *Yard-Man* inference did "not preclude the conclusion that the parties intended to vest lifetime benefits for retirees." *Id.* at 937. The Court's language repeatedly emphasized that a court should look to ordinary contract interpretation, remove any thumb on the scale in either direction, and look to the intent of the parties in the instant case. *Id.*

On remand, we noted a non-exhaustive list of contract principles to apply when interpreting the duration of healthcare benefits in a CBA. *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208–09 (6th Cir. 2016) (*Tackett III*). First and foremost, *Tackett III* emphasized that "[a]s with any other contract, the parties' intentions control." *Id.* at 208. This was highlighted in particular by citing Justice Ginsburg's concurrence: "Under the cardinal principle of contract interpretation, the intention of the parties, to be gathered from the whole instrument, must prevail." *Id.* (internal quotations omitted) (citing *Tackett*, 135 S. Ct. at 937 (Ginsburg, J., concurring)). Furthermore, "[w]hen the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties . . . . [F]or example, the parties' bargaining history." *Id.*

> *Tackett III* went on to discuss the role of durational language post-*Yard-Man*:
>
> [W]hile the Supreme Court's decision [in *Tackett*] prevents us from presuming that "absent specific durational language referring to retiree benefits themselves, a general durational clause *says nothing* about the vesting of retiree benefits," we also cannot presume that the absence of such specific language, by itself, evidences an intent *not* to vest benefits or that a general durational clause says *everything* about the intent to vest.

*Id.* at 209 (emphasis in original). Thus moving forward, clear language of vesting within a contract, as well as evidence beyond the four corners of an ambiguous document, could lead a court to a permissible finding of vested benefits.

With the principles outlined in both *Tackett* and *Tackett III* in mind, we turn to the 1998 CBA between the UAW and Kelsey-Hayes. The CBA contained specific provisions for healthcare benefits. Article III of Supplement H-1 provided for healthcare coverage, including hospital, surgical, medical and prescription drugs, hearing aids, dental, vision, and substance

abuse.  Supplement H-1 further provided "[t]he Health Care Coverages an employee has under this Article at the time of retirement shall be continued for such employees who retire under the following provisions of Article II of the Kelsey-Hayes Hourly Rate Employees Within a Bargaining Unit Pension Plan . . . ."  In the following section, the Supplement promised the "continuance" of health care coverage for retired employees and their surviving spouses.  In contrast with this "continue" language for general healthcare benefits, certain specific healthcare promises were explicitly time-limited in the immediately prior section.

The CBA also contained a general-duration provision that the agreement continued through February 1, 2002, but, absent timely written notice, continued thereafter year to year. This provision set out notice procedures for any modification or termination of the CBA beyond that date.  The CBA also incorporated the Supplemental Insurance Program, providing that Supplement H was "part of this Agreement and subject to all provisions of this Agreement." Within Supplement H, there was a provision that adopted the Supplement H-1 insurance plan, as well as an express adoption of the same February 1, 2002 CBA expiration date.  Based on this language, both Supplement H and H-1 were expressly subject to the CBA's duration clause.

The 1998 CBA also addressed how the Supplement H and H-1 healthcare benefits were to be modified.  Supplement H-1 provided for the Replacement or Supplementation of Plan Coverages "[i]f, in its judgment, the Company considers it advisable in the interest of the eligible primary enrollees another arrangement may be substituted for all or part of the coverages referred to in subsection (a) above."  Changes in healthcare benefits were also addressed in Appendix A to Supplement H-1, which gave Kelsey-Hayes the right to make certain "[c]hanges in healthcare benefits" such as "any rate of payment by the enrollee and any other terms and conditions of Article III . . . at any time . . . . Reasonable notice of such changes will be furnished to enrollees and/or affected parties as necessary."  The Appendix also provided that "[f]rom time to time additional coverages may be provided or existing coverages withdrawn by the Company. In either event, adequate notice shall be given to the enrollees by the carrier(s)."  The governing provisions of Supplement H, however, provided additional requirements:

> In the event the initiation of any benefit or benefits [in the Program] does not prove practicable . . . the Company in agreement with the Union will provide new

benefits and/or coverages as closely related as possible and of equivalent value to
those not provided.

Supplement H also stated that the "options afforded the Company to select plans . . . shall be
exercised only by mutual agreement between the Company and the Union."  In the event that a
conflict arose between the provisions of Supplement H and Supplement H-1, the provisions of
the Supplement H Agreement "will supersede the provisions of the [Supplement H-1] Program
to the extent necessary to eliminate such conflict."

Applying traditional principles of contract interpretation in light of *Tackett*, the threshold
inquiry for this court is whether the language of the 1998 CBA is ambiguous as to the duration of
retirees' healthcare benefits.  *See* 135 S. Ct. at 935, 937.  *Tackett* requires that the parties'
intentions be discerned from the context of the particular agreement.  *Id.* at 933, 935.  Multiple
ambiguities plague our interpretation of the 1998 CBA.

Looking to the whole contract, the 1998 CBA includes three distinct kinds of durational
language for specific provisions.  First, there are specific-duration periods of less than life:
during periods of layoff, for example, healthcare shall be continued "for up to 12 consecutive
months."  Second, there are specific-duration periods for life: for example, retirees "will have
continuing life insurance for life."  Third, there are the healthcare provisions themselves, which
simply say that health care "shall be continued" without specifying for how long.  Along with
these three instances of durational language, all are within the context of the general-durational
clause, which requires mutual affirmative action to terminate the agreement, and the Supplement
H durational clause, which clarifies that Supplements H and H-1 "shall continue in effect until
the termination of the [CBA] of which this is a part."

Supplement H of the CBA, which covers all insurance benefits, requires mutual
agreement to modify Supplement H-1 Article III, which governs healthcare benefits.  Although
Appendix A of Supplement H-1 gives Kelsey-Hayes the right to change terms or conditions or
withdraw certain coverage, Supplement H explicitly states that in the event of any conflict
between Supplements H and H-1, Supplement H (and its mutual-agreement clauses) control.
Therefore, the requirements for mutual agreement control.

Because the contract here barred unilateral modification, the applicability of the general-durational clause to the duration of healthcare benefits raises some ambiguities. Even if the general-durational clauses in the 1998 CBA and Supplement H originally governed the healthcare provisions, Kelsey-Hayes's healthcare obligations are not necessarily extinguished. The general durational clauses do not specify what occurs if the CBA is terminated in part but not in full. The question then becomes whether the contract clearly indicated the parties' intentions regarding the duration of healthcare benefits if the 1998 CBA were terminated but healthcare benefits were continued, as is the case when the parties entered into the 2001 PCA (deeming the 1998 CBA terminated except for specific obligations including retiree healthcare). The durational clause in Supplement H states that healthcare benefits shall continue "until the termination of the Collective Bargaining Agreement to which this is a part." If that refers to the CBA that was terminated by the 2001 PCA, then that provision becomes inconsistent as applied to the healthcare benefits, which the 2001 agreement explicitly continues. If instead Supplement H points to the general-durational clause, then those benefits would be subject to the modification and termination procedures required by the 1998 CBA's general-durational clause—procedures that Kelsey-Hayes clearly did not abide by when unilaterally modifying healthcare plans.

Additionally, there are latent ambiguities throughout the 1998 CBA itself, as the parties incorporated exact language relating to healthcare benefits that they had used from prior agreements. Our understanding of this specific language can be enhanced by looking beyond the text to what both Kelsey-Hayes and the UAW understood these specific phrases to mean in the context of the long-standing relationship and decades of negotiations.

In light of these ambiguities, we look to the mountain of extrinsic evidence available in this case to understand the meaning of terms within the CBA. *See Tackett III*, 811 F.3d at 208–09. Under *Tackett* and *Tackett III*, use of extrinsic evidence of usage and custom is consistent with ordinary rules of contract interpretation. *See Tackett*, 135 S. Ct. at 935; *see also* 12 R. Lord, *Williston on Contracts* § 34:3 (4th ed. 2012) ("In general, absent an express statement or implication to the contrary, the rule is that when parties undertake to conclude a contract, the formation of which is governed by a general usage, the implication is that they intend to proceed

according to the usage in question."). Indeed, Williston instructs that "[i]n these cases . . . the parties are considered to have proceeded on the tacit assumption of the usages, but reduced into writing only the particulars of the agreement, omitting to specify those known usages that are routinely included by mutual understanding." *Id.* The question is "whether the parties . . . were expressly or impliedly aware of the usage in question and expressly or impliedly agreed to be bound by the usage as an integral term of their bargain." *Id. See also Alabama v. North Carolina*, 560 U.S. 330, 346 (2010) (contract terms considered in light of parties' "course of performance" because party conduct is "highly significant" evidence of what they intended in the contract); *Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877) ("There is no surer way to find out what parties meant, than to see what they have done."). These principles apply directly to the UAW and Kelsey-Hayes's 1998 CBA negotiations.

Kelsey-Hayes and the UAW have a long history. Together, they have negotiated a series of CBAs over six decades. Over this long history, the evidence supports a finding that Kelsey-Hayes and the UAW understood the language in the 1998 CBA to create lifetime healthcare benefits for Detroit plant retirees. Specifically, Kelsey-Hayes has both acted in a manner that supports finding vested healthcare rights and provided retiree plaintiffs with additional written documentation that their healthcare was for life.

When negotiating the 1998 CBA, the parties relied on prior judicial decisions interpreting language included in decades of CBAs between the UAW and Kelsey-Hayes. From the 1960s until the early 1990s, according to plaintiffs' unopposed declaration, the CBAs "promised lifetime, company-paid and administered health insurance for pension-eligible retirees . . . . Since the 1960s, [Kelsey-Hayes employees] were told by company officials . . . that retiree health insurance benefits were for the retirees' and spouses' lifetimes and would be fully paid by Kelsey-Hayes." In the 1990s, the vesting of retiree health benefits became the subject of a federal lawsuit. In *Golden v. Kelsey*-Hayes, 73 F.3d 648, 656–57 (6th Cir. 1996), we affirmed a preliminary injunction directing Kelsey-Hayes to reinstate health insurance benefits to an earlier class of these same retirees, in part because of language in prior CBAs between these parties. The district court subsequently granted the Kelsey-Hayes retirees summary judgment, finding that the then-active CBA's healthcare provisions "evince[d] an intention for lifetime health care

benefits." *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173, 1186 (E.D. Mich. 1997) (*Golden II*); *see also id.* at 1176–82 (detailing the extensive extrinsic evidence that Kelsey-Hayes had promised lifetime retiree healthcare since the 1960s). When the UAW and Kelsey-Hayes sat down in 1998 to negotiate the new CBA, it was with the understanding of how the federal courts viewed the language in the *Golden* litigation, and there is no evidence of a different meaning in the record. The language in the new 1998 CBA remained the same. Thus, according to plaintiffs' unopposed declaration, the UAW and Kelsey-Hayes agreed to that language, as understood in the *Golden* cases.

> [The UAW and Kelsey-Hayes] continued this language and the other retirement healthcare promises in the 1998 CBA, knowing that the *Golden* lawsuit confirmed that this language meant that retirees and their family members had lifetime company-paid coverage and that the company could not reduce the promised benefits in the future.

Representatives of the UAW and Kelsey-Hayes specifically agreed to the language that "mutual agreement between the Company and the Union" was required if Kelsey-Hayes wanted to modify healthcare coverage, solidifying the federal courts' interpretation that healthcare benefits continued for life until and unless both parties agreed otherwise.

To further support that the parties both intended the 1998 CBA's language to provide lifetime healthcare benefits, Kelsey-Hayes Vice President of Personnel and Industrial Relations testified in 1994 that "retiree insurance was understood to be a lifetime, vested benefit which could not be suspended or reduced." Letters from Kelsey-Hayes to its employees also support that benefits were for life, and regularly included assurances that each retiree had healthcare for "the rest of his life" and that each surviving spouse similarly had care "for the rest of her life." *See Golden II*, 954 F. Supp. at 1180.

Kelsey-Hayes employee-relations personnel regularly told retiring employees that they would have company-paid healthcare coverage for life. This understanding was based on benefit booklets created by the corporate personnel office and distributed to salaried employees as well as on conversations with corporate officials. *See id.* at 1176–78, 1186. The evidence here strongly suggests that Kelsey-Hayes knew exactly what it was bargaining for with the UAW and

now, given the rising costs of healthcare in the present-day, is trying to reorganize its commitment to save money.

Further, there is evidence that, in 1992, Kelsey-Hayes's lawyers also believed the CBA language there and later replicated in the 1998 agreement provided for lifetime vested healthcare benefits. A 1992 "Post Retirement Benefits" memorandum circulated by the then-corporate "parent" of Kelsey-Hayes reported that the CBAs were reviewed by "outside legal counsel" who advised that:

> [T]he company has not retained the right nor does the contract language allow the company to unilaterally reduce retiree benefits. Worse yet, there is language in many of the contracts, booklets, [and] general descriptive material[] that implies a lifetime commitment.

Evidence after 1998 also suggests that Kelsey-Hayes viewed retirees' healthcare as vested for life. After 2001, Kelsey-Hayes repeatedly offered to buy out retirees' healthcare coverage, calculating the offered values based on the retirees' life expectancies.

The wealth of evidence supports finding that the UAW and Kelsey-Hayes shared an understanding that the 1998 CBA language incorporated the longstanding history that the company provided lifetime healthcare to its retirees. There is no indication that Kelsey-Hayes changed its understanding between the 1994 and 1998 agreements. In fact, there is a judicial decision that definitely interprets the language to mean healthcare benefits had vested. Although defendants argue that, pursuant to *Tackett* and the overturning of the *Yard-Man* inference, this court cannot now rely on a pre-*Tackett* decision, that does not change that the parties, at the time they were negotiating and forming the 1998 CBA, understood that the very language they continued to include in the 1998 agreement meant what the federal courts had said just previously in the *Golden* litigation.

## B.

The dissent would rely on our recent decision in *Gallo v. Moen*, 813 F.3d 265 (6th Cir. 2016), and reverse the injunction, finding the 1998 CBA is unambiguous and that the benefits did not vest. The issue in *Gallo* was the same: whether a particular collective bargaining

agreement entitled a class of retirees to vested healthcare benefits, unalterable for life. *See id.* at 267. However, that court found healthcare benefits had not vested:

> [T]he contracts never make that commitment [of a right to healthcare benefits for life]. Yes, Moen offered retirees healthcare benefits. And yes Moen, like many employers, may have wished that business conditions and stable healthcare costs . . . would permit it to provide similar healthcare benefits to retirees throughout retirement. But the question is whether the two parties signed a contract to that effect. Nothing of the sort appears in the collective bargaining agreements.

*Id.* at 269. The dissent's reliance on *Gallo* fails for two reasons.

First, the dissent fails to realize that this case is factually distinct from *Gallo*. While the decision in *Gallo* hangs its hat on a general-durational clause, the CBA we have before us is materially different. The 1998 CBA, too, has a general-durational clause. But in *Gallo*, the general-durational clause permitted unilateral termination or modification of the CBA with mere notice. Here, by contrast, the 1998 CBA's general-durational clause perpetuated the agreement year-to-year and permitted modification only if the parties arranged a conference to negotiate after timely written notice of one party's desire to modify, and the expressly superseding provisions of Supplement H required mutual agreement to the terms of any such modification. Thus, and as we discussed above, a reading of the *whole* instrument—the general durational clause and Supplements H and H-1—leaves ambiguous what the parties intended the duration of healthcare benefits to be, should the entire agreement be terminated except for the healthcare benefits, which explicitly continue per the 2001 PCA. The use of three different types of durational language for specific provisions within the agreement contributes further to the ambiguity.

Second, the dissent takes our opinion in *Gallo* too far. Nothing in *Gallo* precludes looking to extrinsic evidence, consistent with *Tackett* and *Tackett III*, where a CBA is ambiguous as to the duration of healthcare benefits. That is precisely what we find here. The 1998 CBA is ambiguous as to the duration of healthcare benefits. Absent is explicit language that the benefits at issue vest for life, but also absent is a clear indication that they do not. To the contrary, there is overwhelming evidence that the language used in the 1998 CBA specifically meant that benefits would vest for life, informed by the decades-long bargaining relationship between

Kelsey-Hayes and the UAW. Looking at the express and implied terms of the agreement, in light of the whole document, we find ambiguity that requires us to look further to discern the intent of the parties as to these particular benefits.

The dissent's reading of *Gallo* creates an unnecessary conflict between *Gallo* and our decision in *Tackett III*, which as a preceding published opinion controls. The dissent essentially finds a reverse-*Yard-Man* presumption where benefits vest *only* if there is clear and explicit language, contrary to the Supreme Court's mandate in *Tackett* that no thumb on the scale should exist in either direction. *Gallo* does not mandate such a reading, nor does it dictate the outcome in this case.

Because of the "veritable mount of evidence" that healthcare was vested for life, plaintiffs are entitled to receive the healthcare they were promised. *See Golden II*, 954 F. Supp. at 1188. Although it might seem practical for Kelsey-Hayes to now modify its healthcare coverage model and utilize Medi-gap coverage and HRAs, that is not what the parties agreed. Instead, they adopted procedures under which the parties can negotiate for changes. Should Kelsey-Hayes want to modify retirees' healthcare, it must utilize those bargained-for procedures, and cannot try to circumvent them by way of unilateral changes.

## C.

As a final matter, to the extent plaintiffs argue that claim and issue preclusion prevent defendants from re-litigating issues in this case, these arguments are unpersuasive and unnecessary to resolve the case. It is well-established law in this circuit that, should there be a significant change in precedent, cases decided under prior precedent that has been reversed will not have preclusive effects. *See Comm'r v. Sunnen*, 333 U.S. 591, 599–600 (1948); *see also Bell v. Bd. of Educ.*, 683 F.2d 963, 966 (6th Cir. 1982) (noting that one ground for not applying collateral estoppel is a significant change in the law).

*Tackett* explicitly overruled more than three decades of the *Yard-Man* presumption in the Sixth Circuit, stating that a presumption toward lifetime benefits violates basic principles of contract interpretation. Although the decisions relied on by the plaintiffs did not expressly rely on *Yard-Man*, they were decided when *Yard-Man* remained the law in this circuit, and given the

Court's strong language in *Tackett*, we will not give pre-*Tackett* decisions on these exact issues preclusive effect. That does not mean, however, that pre-*Tackett* courts' interpretation of language that parties subsequently agree to maintain cannot inform our understanding of their intent at the time they entered into the CBA.

IV.

A.

In its ruling, the district court declined to hold Northrop Grumman liable, citing a lack of sufficient evidence in the record to determine successor liability. The district court recognized "a successor corporation generally is not responsible for its predecessors' liabilities unless they are expressly assumed."

Plaintiffs did not allege any close historical relationship between TRW and Northrop Grumman, apart from the purchase of the name as one of many assets. They also did not provide any evidence that Northrop Grumman expressly assumed TRW's liabilities. In issuing a permanent injunction, the district court, potentially in oversight, did not exclude Northrop Grumman from the defendants to whom the permanent injunction applied. Therefore we modify the permanent injunction to exclude Northrop Grumman.

B.

Once modified to exclude Northrop Grumman, we affirm the injunction as to the remaining parties. The scope of the injunction easily passes abuse-of-discretion review. The district court's order simply returns plaintiffs and defendants to their status quo pursuant to the 1998 CBA. If Kelsey-Hayes wishes to modify the form of the lifetime healthcare benefits, the parties can negotiate pursuant to the established bargaining procedure.

V.

For these reasons, we affirm the district court's award of partial summary judgment, and modify the permanent injunction to exclude Northrop Grumman.

No. 15-2285                    *UAW v. Kelsey-Hayes Co.*                    Page 17

---

### DISSENT

---

RONALD LEE GILMAN, Circuit Judge, dissenting.  The 1998 Collective Bargaining Agreement (CBA) between Kelsey-Hayes and the UAW provides that healthcare benefits "shall be continued for such employees who retire . . ."  Reasonable jurists could conclude that the quoted language is ambiguous, thus allowing them to look at extrinsic evidence in order to ascertain its meaning.  On the other hand, reasonable jurists could just as easily conclude that the quoted language is unambiguous when read in conjunction with the CBA's general durational clause and the Supplement H durational clause, thus precluding any reference to the extrinsic evidence. Our need—indeed, our authority—to weigh in on this issue is obviated by this court's recent decision in *Gallo v. Moen, Inc.*, 813 F.3d 265 (6th Cir. 2016), *cert. denied*, __U.S.__ (Oct. 31, 2016), which determined that materially indistinguishable language was unambiguous. Because I believe that the outcome of the case before us is controlled by *Gallo*, I respectfully dissent.

*Tackett* instructs us to apply "ordinary principles of contract law" in interpreting CBAs. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015).  Among those principles is the rule that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.* at 937.  On remand, this court in *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208-09 (6th Cir. 2016) (*Tackett III*), noted several additional principles of contract law, including the well-established rule that extrinsic evidence should be consulted to determine the intent of the parties only when the contract language is ambiguous. *Id.* at 208-09.

Although *Tackett III* expounds on a number of guiding principles for the interpretation of CBAs, its holding was simply to remand the case back to the district court with instructions to interpret the CBA in accordance with those principles.  *Id.* at 210.  Much of *Tackett III*'s language is therefore dicta because the discussion of contract principles was not necessary to the remand ruling. *See Coca-Cola Co. v. Procter & Gamble Co.*, 822 F.2d 28, 30 (6th Cir. 1987)

(defining dicta as portions of an opinion that are "not essential to the court's holding" and therefore "not binding precedent").

This court, however, did have an opportunity to apply these ordinary contract principles to a specific CBA in _Gallo_. The _Gallo_ court applied the principles to conclude that the CBA in that case unambiguously did not vest retiree healthcare benefits for life. _Gallo_, 813 F.3d at 273-74. And despite the majority's few paragraphs that attempt to distinguish _Gallo_ from the present case, _Gallo_ cannot so easily be swept under the rug.

_Gallo_ is in fact legally indistinguishable from the present case. The _Gallo_ court faced an identical issue: whether a series of CBAs entitled a class of retirees to lifetime healthcare benefits. In _Gallo_, the CBA contained terms stating that healthcare benefits for retirees "will be provided," "will be covered," and would "[c]ontinue." _Id_. at 269. These provisions were determined not to be specific enough to override the CBA's general durational clause and, therefore, the healthcare benefits did not vest for life. _Id_. The court held that "absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA." _Id_. In making that determination, this court did not look "beyond the contract's four corners" and ruled that, because the contract was unambiguous, the consideration of extrinsic evidence was inappropriate. _Id._ at 274.

Much like the CBA at issue in _Gallo_, the 1998 CBA here specified that healthcare benefits "shall be continued" for retirees and provided for the "continuance" of healthcare coverage for retired employees and their surviving spouses. No specific expiration date for these benefits was contained in these clauses. The 1998 CBA, however, contained a general durational clause, which provided that the CBA terminated on February 1, 2002. Supplement H, which dealt with insurance benefits generally, also specifically adopted this provision through its own durational clause. The Supplement H durational clause specified that the healthcare benefits detailed in Supplement H-1 "shall continue in effect until the termination of the CBA in which this is a part." These durational clauses give meaning to the promise that healthcare benefits "shall continue." That is, the terms "shall be continued" and "continuance" serve to guarantee healthcare benefits until the 1998 CBA expired, nothing more. _See id._ at 269.

The majority asserts that, despite these similarities, two factual distinctions mandate a conclusion different from the one arrived at in *Gallo*.  First, the majority contends that a reading of the "whole instrument" leaves ambiguous what the parties intended the duration of healthcare benefits to be "should the entire agreement be terminated except for the healthcare benefits." (Maj. Op. 14)  Indeed, the 2001 Plant Closing Agreement (PCA) terminated the 1998 CBA and released Kelsey-Hayes from all obligations except for those specifically excepted from termination and release. The obligations concerning retiree healthcare were among those not released under the PCA, but were instead to be continued under the "applicable law and benefit plans (including those provisions contained in collective bargaining agreements)."  These healthcare benefits therefore continued for the retirees under the terms of Supplement H of the 1998 CBA.  The majority claims that the 1998 CBA and the 2001 PCA are inconsistent and thus render the duration of the healthcare benefits ambiguous.

I respectfully disagree. Not only is there no inconsistency, but this very scenario was actually addressed and resolved in *Gallo*. The CBA at issue in *Gallo* had similarly been terminated by a plant closing agreement.   This plant closing agreement provided that "[h]ealthcare . . . and related benefits shall continue . . . for all retirees and spouses *as indicated under the Collective Bargaining Agreement*."  *Id.* at 271 (emphasis in original).  The *Gallo* court concluded that "[t]he most natural reading of the plant closing contract is that it offers the *same* benefits under the *same* conditions as the [previous] CBA."   *Id.* (emphasis in original). According to the court, the plant closing agreement "did not need explicit durational language because it incorporated the terms of the [previous] CBA, which did not provide for vested benefits." *Id.* at 273.

In the present case, the 2001 PCA similarly terminated the 1998 CBA while continuing healthcare benefits for retirees under the "applicable law and benefit plans (including those provisions contained in collective bargaining agreements)."   This means that the retirees' healthcare benefits were unambiguously still governed by the terms of Supplement H and its durational clause. The only effect of the PCA on these benefits, therefore, is that they continued through February 1, 2002, which was the expiration date supplied by the 1998 CBA's general durational clause and adopted by Supplement H.

Second, the majority tries to distinguish this case from *Gallo* by noting that the 1998 CBA used "three different types of durational language for specific provisions." (Maj. Op. 14) These clauses are: (1) the "shall be continued" and "continuance" language in the healthcare provisions, (2) provisions, such as those detailing healthcare benefits during layoffs, that guarantee benefits for specific periods of less than life, and (3) provisions explicitly providing pension benefits for life. Contrary to the majority's assertions, the use of these different durational clauses does not cause any ambiguity. In fact, the CBA at issue in *Gallo* also contained provisions vesting certain benefits for life, yet the court held that these lifetime durational provisions actually rendered the healthcare provisions *unambiguous. Id.* at 270.

Ordinary principles of contract law demand that a contract "should be read to give effect to all its provisions and to render them consistent with each other." *Id.* (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)). As in *Gallo*, we must therefore "assume that the explicit guarantee of lifetime benefits in some provisions and not others means something." *Id.* The explicit guarantee in the 1998 CBA of certain benefits for life and for specific periods of less than life for other benefits indicates that Kelsey-Hayes and the UAW could have included similar provisions when negotiating healthcare benefits. Instead, they simply provided that these benefits "shall be continued."

This "difference in language demands a difference in meaning." *See id.* The difference has to be that the healthcare benefits were meant to continue for some period less than the lifetime of the retirees. As precisely put in *Gallo*, "[i]f *Tackett* tells us anything, . . . it is that the use of the future tense without more—without words committing to retain the benefit for life— does not guarantee lifetime benefits." *Id.* at 271. In fact, Supplement H explicitly adopts the termination date of the 1998 CBA.

The majority asserts that my dissent "takes our opinion in *Gallo* too far." (Maj. Op. at 14) But I fail to see how, since ordinary contract principles support *Gallo*'s holding that we should not infer lifetime benefits when, absent a specific carve-out, there is a general durational clause in the CBA. My analysis is thus based on a general principle of contract law, not on a "reverse *Yard-Man* presumption."

Nor am I creating an unnecessary conflict with this court's decision in *Tackett III*. In fact, I agree with the majority's conclusion that "nothing in *Gallo* precludes looking to extrinsic evidence, consistent with *Tackett* and *Tackett III*, where the CBA is ambiguous as to the duration of healthcare benefits." (Maj. Op. at 14) What *Gallo* does preclude, however, is a finding that the 1998 CBA between Kelsey-Hayes and the UAW is ambiguous. *Gallo* applied ordinary contract principles to the CBA before it to conclude that the healthcare benefits were unambiguously not vested for life. Because the facts of this case are materially indistinguishable, I see no way to avoid arriving at the same conclusion.

*Gallo*'s holding and my interpretation of the 1998 CBA are further supported by the Supreme Court's endorsement of this court's earlier holding in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998). *See Tackett*, 135 S. Ct. at 937. *Sprague* dealt with the vesting of retiree healthcare benefits in the context of non-collectively bargained contracts. *Sprague*, 133 F.3d at 392-93. The *Sprague* court held that an employer's commitment to vest lifetime healthcare benefits should not be inferred lightly and that "the intent to vest must be found in the plan documents and must be stated in clear and express language." *Id.* at 400. In *Tackett*, the Supreme Court cited *Sprague* to underscore *Yard-Man*'s "deviation from ordinary principles of contract law," such as the principle that "courts should not construe ambiguous writings to create lifetime promises." *Tackett*, 135 S. Ct. at 936-37. The comparison of *Sprague*'s "clear and express" requirement with the *Yard-Man* inference that was rejected by the Supreme Court logically leads to the conclusion that the *Tackett* Court endorsed this court's approach in *Sprague*. And here, of course, there is no clear and express vesting of lifetime healthcare benefits in the 1998 CBA.

In my opinion, this leaves the majority with nothing more than its point that Kelsey-Hayes' management has made statements over the years that contradict its current position that retiree healthcare benefits are not vested for life. (*See* Maj. Op. 11-13). This would be a strong argument if we were free to conclude that the 1998 CBA was ambiguous as to the duration of retiree healthcare benefits. But for the reasons stated above, I believe that we are bound by *Gallo*'s determination that materially indistinguishable language regarding such benefits is *unambiguous*, thus precluding the consideration of all the extrinsic evidence proffered by the

No. 15-2285                      *UAW v. Kelsey-Hayes Co.*                      Page 22

UAW. *See Gallo*, 813 F.3d at 273 (holding that "[t]he first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation"); *see also Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (holding that "[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.").

One final thought. Although legally irrelevant, I must confess that I have been puzzled by the apparent disconnect between the language in the 1998 CBA that does not promise lifetime healthcare benefits and the extrinsic evidence to the contrary. I believe that the answer to the puzzle lies in the very fact that retiree healthcare benefits were a feature in every CBA between the parties for over six decades.  The parties, in other words, simply assumed that the benefits would continue for life because neither side anticipated the upheaval in the automotive industry or had any reason to think that any future CBA would alter the pattern of the past 60 years.  This likely led to "loose talk" about lifetime healthcare benefits, with no one feeling the need to articulate the implied caveat that these benefits, like all employee benefits not explicitly vested for life, were dependent on the existence of a current CBA between Kelsey-Hayes and the UAW.

In any event, I believe that our decision in this case is controlled by *Gallo*, whether or not my musing about the nature of the extrinsic evidence is correct.  I therefore respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No.   15-2285

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW); JAMES WARD;
MARSHALL HUNT; RICHARD GORDON,
             Plaintiffs - Appellees,

             v.

KELSEY-HAYES COMPANY; TRW AUTOMOTIVE
HOLDINGS CORPORATION; NORTHROP GRUMMAN
SYSTEMS CORPORATION,
             Defendants - Appellants.

┌─────────────────────────────┐
│          **FILED**          │
│        Apr 20, 2017         │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘

Before:   GILMAN, GIBBONS, and STRANCH, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's grant of partial summary judgment is AFFIRMED, and the permanent injunction is MODIFIED to exclude Northrop Grumman.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk